1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

M. Anderson Berry, SBN 262879
Leslie Guillon, SBN 222400
CLAYEO C. ARNOLD,
A PROFESSIONAL LAW CORPORATION
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
email: aberry@justice4you.com

Attorneys for Plaintiff-Relator

**FILED**

**Feb 01, 2019**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA *ex rel.*
Kira Hutcherson,

                    Plaintiffs,

vs.

GOLDEN 1 CREDIT UNION,

                    Defendant.

Case No.: 2:19-cv-0197 JAM EFB

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT AND THE FINANCIAL INSTITUTIONS REFORM, RECOVERY, AND ENFORCEMENT ACT**

**DEMAND FOR JURY TRIAL**

**FILED UNDER SEAL**
(31 U.S.C. §§ 3729, *et seq.*)
(False Claims Act)

**COMPLAINT**

This is an action brought on behalf of the United States of America by Kira Hutcherson ("Relator"), by and through her attorneys, against Golden 1 Credit Union ("Golden 1" or "Defendant") pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA"). This action seeks to recover treble damages and penalties under the FCA and civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

## I. PRELIMINARY STATEMENT

1.      Federal government mortgage programs depend on lenders to approve only eligible home loans using relevant, current guidelines. Defendant Golden 1 has, since at least approximately May 2015, made materially false statements and claims to the United States in connection with Golden 1's mortgage lending business, including false certifications, representations and warranties made in accordance with its various programs operated by or for the United States. The affected programs include the Federal Housing Administration ("FHA") of the Department of Housing and Urban Development ("HUD"), and government sponsored enterprises including the Federal National Mortgage Association ("Fannie Mae")(collectively, the "Government Programs").[1]

2.      To enrich itself at the expense of the affected programs, Golden 1 engaged in a routine practice of reckless loan origination, underwriting, and processing of single-family mortgage loans participating in the Government Programs. Upon information and belief, the United States would not have lost funds associated with the Government Programs but for Golden 1's false statements, including Golden 1's certifications, representations and warranties that it complied with the Government Programs' relevant, current guidelines.

3.      Golden 1's wrongful practices include knowingly submitting or causing to be submitted false claims for reimbursement to Government Programs, by a scheme that includes applying constant pressure on home loan department managers, loan officers, loan processors,

---

[1]  Fannie Mae and Freddie Mac are "government sponsored enterprises" ("GSEs"), which are private corporations established by Congress to facilitate home ownership through the provision and development of secondary markets for conventional mortgages.

and underwriters to originate and underwrite more and more Government Program loans as quickly and economically as possible. In this mad rush for profits, Golden 1 knowingly:

(i)     failed to satisfy its duty to conduct due diligence in underwriting and processing mortgage applications submitted in connection with Government Programs;

(ii)    failed to provide sufficient training and guidance to its inexperienced staff;

(iii)   employed loan processors and underwriters that were unqualified and/or insufficiently licensed to perform their duties;

(iv)   submitted or caused to be submitted information on loan applications that was not true, correct, complete or properly verified; and

(v)    failed to exercise required quality control measures to help stem rampant fraud.

4.    Ultimately, Golden 1's misconduct bears directly on the borrower's ability to repay the loan, such that the borrower's default was a reasonably foreseeable outcome, resulting in damages to the United States with additional, substantial losses expected in the future. Those losses include the myriad costs associated with additional mortgage defaults, home evictions and foreclosures – all of which are a substantial drain on agencies' resources and also lower payments from government sponsored enterprises to the United States Treasury.

5.    The FCA provides liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or who otherwise improperly makes false statements to the government or to a government "contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. §§ 3729(a)(1)(A)-(G) and (b)(2)(A). Liability also arises for "reverse false claims," where any person "knowingly" concealed or "knowingly" and improperly avoided or decreased an obligation to reimburse the United States. 31 U.S.C. § 3729(a)(1)(G).

6.     FIRREA, among other things, prohibits any person from knowingly making any false statement or report, or willfully overvaluing any land, property, or security, for the purpose of influencing in any way the action of Government Programs.

7.     Based on the foregoing provisions, Relator asserts violations of federal law as a result of false claims made by Defendant in connection with the Government Programs. Relator acquired first-hand knowledge of these practices through her work as a home loan underwriter at Golden 1's headquarters in Sacramento, California, and through her daily interactions with Golden 1 employees, including managers, loan officers, loan processors and other underwriters with whom she worked for years.

8.     Relator seeks to recover all available damages, civil penalties, and all other relief available for losses caused by Golden 1's fraud, including treble damages, and penalties under the FCA and FIRREA. Damages owed to the United States include, but are not limited to, the full value of all reimbursements under Government Programs that the United States would not have paid but for Golden 1's false claims, and for all funds not paid to the United States by Government Programs as obligated due to Golden 1's knowing presentation of defective loans to those programs.

9.     Upon information and belief, the United States would not have paid Defendant's claims had it been aware of the falsity of Golden 1's claims and certifications.

10.     Upon information and belief, the United States would not have permitted Golden 1 to participate in the Government Programs had it been aware of its false certifications of compliance with those programs and/or Golden 1's culture, practices and scheme to increase profits through misuse of Government Programs.

## II. JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 31 U.S.C. § 3732, conferring jurisdiction for actions brought under 31 U.S.C. §§ 3729 and 3730, and under 28 U.S.C. § 1331, conferring jurisdiction over all civil actions arising under the laws of the United States.

12.     This Court has personal jurisdiction over Golden 1 under 31 U.S.C. § 3732(a) because Golden 1 transacts business and/or is found in this District.

13.   Venue is proper under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because a substantial part of the events giving rise to the claims occurred in this District or Golden 1 may be found here, and/or acts proscribed by 31 U.S.C. § 3729 occurred in this District.

14.   Relator is an "original source" and is otherwise authorized to maintain this action in the name of the United States as contemplated by the FCA.

15.   None of the allegations set forth in this Complaint are based upon any public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media of which Relator was not the original source of the information.

16.   Relator will comply with the statutory requirements of 31 U.S.C. § 3730(b)(2) by serving on the United States a copy of this Complaint and a written disclosure statement of substantially all material evidence and information that Relator possesses.

17.   As required, this complaint has been filed *in camera* and under seal and shall not be served on Defendant until the Court so orders.

### III. PARTIES

18.   Defendant Golden 1 Credit Union is a state-chartered credit union and nonprofit mutual benefit corporation qualified to do business in California, with its principal place of business in Sacramento, California. Golden 1 promotes and sells its products throughout this state.

19.   Golden 1 originates mortgage loans that it then sells in the secondary market to government sponsored enterprises, including Fannie Mae, for a profit. Upon information and belief, Golden 1 is also a HUD Direct Endorsement Lender, offering FHA insured loans to its credit union members. Golden 1 is also a "portfolio lender," holding a portfolio of loans that it services itself.[2]

20.   Golden 1 claims to have almost 1 million credit union members, with assets over $11.5 billion – which ranks Golden 1 as the sixth largest credit union in the United States and

---

[2] A portfolio lender generates fees from originating mortgages and profits from the net interest rate spread between interest-earning assets and the interest paid on deposits in their mortgage portfolio.

number one in California.

21.    Relator Kira Hutcherson is a resident of Sacramento County, California. From approximately January 2016 through April 2018, she was employed as an underwriter in Golden 1's home loan headquarters in Sacramento, California. Ms. Hutcherson has extensive experience in the home loan industry. From 2005 to 2008 she worked for HSBC Bank USA in Vacaville, California, as a home loan officer and assistant branch manager. From 2010 to 2014 she worked for Genworth Financial, Inc. in Rancho Cordova, California, as a home loan officer, loan processor and ultimately an underwriter. Ms. Hutcherson joined Golden1 in January 2016 and was promoted to underwriter in April 2016. As such, Ms. Hutcherson has originated, processed and underwritten thousands of home loans associated with Government Programs, and is familiar with, among other things, the relevant guidelines and required policies and processes used by lenders to accurately underwrite Government Program mortgages.

22.    Ms. Hutcherson has undergone extensive training, testing and the required assessments throughout the years including passing NMLS, becoming licensed in over 30 states to originate loans, annual compliance training, and continuing to pass state and federal background checks to remain compliant.

## IV. FACTUAL BACKGROUND

### Civil Statutes to Combat Mortgage Fraud

#### The False Claims Act

24.    The FCA prohibits the submission of false or fraudulent claims for payment to the United States or the making of false statements for the purpose of causing a false claim to be paid. A person who violates the FCA is liable to the United States for civil penalties and for three times the amount of the government's damages. 31 U.S.C. § 3729(a)(1).

25.    A violation of the FCA occurs when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

26.     Moreover, a FCA violation also occurs where a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

27.     One definition of "claim" under the Act is "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that . . . is presented to an officer, employee, or agent of the United States." *Id*. § 3729(b)(2)(A)(i).

28.     A request or demand not directly presented to the government, however, is also a "claim" under the FCA. The Act defines that term as:

> [A]ny request or demand, whether under a contract or otherwise, for money or property *and whether or not the United States has title to the money or property,* that . . . is made to a contractor, grantee, or other recipient, *if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.*

31 U.S.C. § 3729(b)(2)(A)(ii). The italicized language above was added in 2009 when Congress amended the FCA in the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617. Congress enacted FERA in part to "help protect Americans from future frauds that exploit the economic assistance programs intended to restore and rebuild our economy." S. Rep. No. 111-10, at 1-2 (2009).

29.     The FCA specifically excludes from the definition of "claim" only "requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property." *Id*. § 3729(b)(2)(B).

### The Financial Institutions Reform, Recovery, and Enforcement Act

30.     Congress enacted FIRREA in 1989 to reform the federal banking system. Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses – as established by a preponderance of the evidence – that affect financial institutions and certain

government agencies. *See* 12 U.S.C. § 1833a(e).

31.     FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $1 million per day or $5 million, whichever is less. 12 U.S.C. § 1833a(b)(l)-(2). The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss. 18 U.S.C. § 1833a(b)(3).

32.     FIRREA, among other things, prohibits any person connected in any capacity with HUD from making any false entry in any book, report or statement of or to HUD with the intent to defraud HUD or any other body politic or to deceive any officer, auditor, examiner, or agent of HUD or of a department or agency of the United States.

33.     FIRREA also prohibits:

- any person from knowingly making any false statement or report, or willfully overvaluing any land, property, or security, for the purpose of influencing in any way the action of Government Programs.;

- using the mails or wires for the purpose of executing a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; and, among other things,

- any person from, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation.

### The Government Programs Defrauded by Golden 1

34.     Golden 1 participates in numerous Government Programs in connection with its mortgage lending business, including FHA and Fannie Mae. The Government Programs require participants, including Golden 1, to meet certain standards and requirements in connection with participation in the programs, including requirements in connection with underwriting loans referred to the Government Programs.

35.     The Government Programs also require participants, including Golden 1, to certify their compliance with the Government Programs for purposes of eligibility to participate in the Government Programs. For example, Golden 1 certified that "[e]very loan sold to Fannie Mae must be underwritten in order to establish that the borrower has the ability, willingness, and capacity to repay the debt. Sellers must have adequate internal controls and processes in place to evaluate borrower income and liabilities."

36.     The Government Programs also require participants, including Golden 1, to certify compliance with other specific standards and requirements of the Government Programs for each mortgage loan submitted for inclusion in the Government Programs.

37.     The following are non-exhaustive descriptions of the standards and requirements set forth by the relevant Government Programs:

***Fannie Mae***

38.     Fannie Mae and Freddie Mac are government sponsored enterprises ("GSEs"), which are private corporations established by Congress to facilitate home ownership through the provision and development of secondary markets for conventional mortgages.[3] Upon information and belief, Golden 1 originated and sold loans to Fannie Mae that did not meet its requirements.

39.     In 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654, which, among other things, established the Federal Housing Finance Agency ("FHFA") to provide oversight of the GSEs. HERA, § 1311(b)(2), codified at 12 U.S.C. § 4511(b)(2). Shortly thereafter, on September 7, 2008, the agency exercised its statutory authority to place the GSEs into FHFA-administered conservatorships. *See* 12 U.S.C. § 4617(a)(2)(authorizing Director of FHFA to be appointed GSEs' conservator).

40.     The U.S. Department of the Treasury ("Treasury") exercised its authority under HERA to enter into preferred stock purchase agreements with the GSEs through their conservator,

---

[3] *See* Housing and Urban Development Act of 1968, Pub. L. No. 90-448, Title VIII (Aug. 1, 1968) (establishing Fannie Mae as a "Government-sponsored private corporation"), codified at 12 U.S.C. § 1716b; Emergency Home Finance Act of 1970, Pub. L. No. 91-351, Titles II and III (July 24, 1970)(authorizing Fannie Mae to provide a secondary market for conventional mortgages and establishing Freddie Mac for similar purposes).

as well as taking other measures to maintain and fund the GSEs' continuing operations. *See* 12 U.S.C. § 1719(g) (Treasury authority to purchase securities in Fannie Mae).

41.     As part of its mission, Fannie Mae purchases single-family residential mortgages from mortgage companies and other financial institutions, including Golden 1, providing revenue that allows the mortgage companies to fund additional loans. The GSEs then either hold the loans in their investment portfolios or bundle them into mortgage-backed securities ("MBS") that they sell to investors.

42.     The GSEs earn revenue in their single-family business line primarily from "guaranty fees"; that is, fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans pooled into MBS. In general, the GSEs are profitable so long as their income from investments and guaranty fees exceeds the principal and interest that they must pay out on any defaulted loans that they guarantee.

43.     Prior to late 2007, GSE preferred stock was widely regarded to be a safe investment. In fact, federal regulators permitted banks to invest up to 100 percent of their investment capital in GSE preferred securities. In the second half of 2007 and the first half of 2008, however, as the default rates on defaulted loans climbed, Fannie Mae lost $9.5 billion and Freddie Mac lost $4.7 billion. Accordingly, Fannie Mae's Form 10-K for 2007 reported a "material increase in mortgage delinquencies and foreclosures[ . . . ]" and expected "increased delinquencies and credit losses in 2008 as compared with 2007."

44.     On September 6, 2008, pursuant to HERA and in response to the insolvency of the GSEs due to mortgage defaults and delinquencies, the FHFA Director placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs. 12 U.S.C. § 4617(b)(2).

45.     On September 7, 2008, the FHFA, in its capacity as the GSEs conservator, executed a Senior Preferred Stock Purchase Agreement (the "SPA") with the U.S. Department of the Treasury ("Treasury"). Under that agreement, the United States – through Treasury – made billions of dollars of emergency capital available to the GSEs, in exchange for preferred shares of Fannie Mae stock and various related benefits.

46.     The SPA was executed to ensure that the GSEs remained financially viable, which served the important government interest of stabilizing the housing markets.[4] As part of the SPA, Fannie Mae agreed to make quarterly dividend payments to Treasury. Under the original terms of the SPA, the amount Fannie Mae owed in dividends each quarter was equal to 10% of the total amount of funds Fannie Mae had obtained from Treasury.

47.     In May 2009, the FHFA amended the SPA to double the maximum amount of funds available to Fannie Mae, from $100 billion to $200 billion. The SPA was amended for a second time in December 2009.

48.     On August 17, 2012, Fannie Mae and Treasury once again amended the SPA (the "Third Amendment"), this time changing the nature of Fannie Mae's quarterly dividend obligation. Instead of making the 10% payment each quarter, under this version of the SPA Fannie Mae agreed that the amount of the dividend it was obligated to pay Treasury each quarter would be, effectively, the amount by which its net worth exceeded a $3 billion capital reserve. The deal is not meant to simply pay back Treasury the funds, but to share the GSEs' profits with the United States.

49.     Since the execution of the Third Amendment, Fannie Mae has paid Treasury quarterly dividends of varying amounts, calculated according to the terms of the Third Amendment as described above. Fannie Mae's dividend obligation as set forth in the Third Amendment remains in effect today.

_Fannie Mae Certifications, Representations and Warranties_

50.     In purchasing loans for their single-family business, GSEs operate on a _rep and warrant_ framework, relying on lenders' representations and warranties that their loans comply in all respects with the strict standards outlined in the GSE selling guides and lender sales contracts. The loans sold to Fannie Mae must comply with its Single-Family Selling Guide (the "Selling Guide").[5] The Selling Guide and contracts set forth mandatory requirements for underwriting,

---

[4] _See_ Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers, Sept. 7, 2008 (available at https://www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx).

[5] The December 4, 2018 version of the Fannie Mae Selling Guide is available at: https://www.fanniemae.com/content/guide/sel120418.pdf (last visited Dec. 11, 2018); the

processing, originating, documentation, quality control, and self-reporting. These requirements help to ensure the loans are good so Fannie Mae can avoid the losses associated with defaults.

51.     Because the lenders' *reps and warrants* allow the GSEs to purchase and guarantee loans without having to perform a thorough credit evaluation themselves on each loan, *reps and warrants* play an important role in the housing finance market.

52.     The purchase contracts between Fannie Mae and a lender include both a long-term master agreement that supplements the Selling Guide and short-term contracts that grant variances or waivers from the Selling Guide requirements to permit a lender to sell a specific loan product. The GSEs typically renegotiate such variances on an annual basis based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance altogether.

53.     The *rep and warrant* model operates on the assumption that the sellers of the loans – usually also the originators of the loan as is the case with Golden 1 – are in a superior position of knowledge about the quality of the loans. Lenders assume certain obligations in accordance with their superior position of knowledge, such as the duty to perform prudent underwriting and quality assurance checks as required by the selling guides, and to self-report loans they identify as fraudulent, non-compliant with GSE guidelines, or otherwise materially defective.

54.     The GSEs also delegate the underwriting of the loans they purchase to the lenders. Although the GSEs reserve the right to sample a portion of the loans they purchase to ensure compliance with the guidelines, they generally conduct full file reviews only if a loan goes into default.

55.     Upon information and belief, Golden 1 entered into a Mortgage Selling Contract (the "Master Contract") with Fannie Mae. As set forth in that Master Contract, in sum or substance, Golden 1 as lender made several specific representations and warranties regarding each mortgage, including warranties that the mortgage conforms to all applicable requirements in the

---

February 23, 2016 version is here: https://www.fanniemae.com/content/guide/sel022316.pdf (last visited Dec. 11, 2018); Numerous historical versions of the Selling Guide are available on Fannie Mae's website: https://www.fanniemae.com/content/guide/selling/ (last visited Dec. 20, 2018).

Selling Guide and the Master Agreement (including certifying that all information was true and correct), and that Golden 1 knows nothing involving the mortgage, the property, the mortgagor, or the mortgagor's credit standing that can reasonably be expected to: (i) cause private institutional investors to regard the mortgage as an unacceptable investment; (ii) cause the mortgage to become delinquent; or (iii) adversely affect the mortgage's value or marketability.

56. Upon information and belief, the relevant agreements expressly affirmed that Golden 1's representations apply in their entirety to each mortgage it sold to Fannie Mae, were made as of the date transfer is made, and continue after the purchase of the mortgage.

57. In representing to Fannie Mae that the loans sold to the GSE are an acceptable investment, and that Golden 1 would exercise due diligence in originating and underwriting the loans, Golden 1 further warranted that: (i) "all required mortgage loan delivery data is true, correct, and complete, even for such data elements that are not required to qualify a borrower or underwrite a loan";[6] (ii) automated underwriting conditions are met for loans processed through an automated underwriting system,[7] (iii) no fraud or material misrepresentations have been committed by any party, including the borrower; (iv) "at the time Fannie Mae releases cash or MBS in exchange for the mortgage loan, no person has any right of rescission pursuant to the Truth in Lending Act or other law which has not expired or otherwise terminated."[8] These requirements are set forth in the yearly versions of the Selling Guide, and remain in effect today.

58. During the relevant time, Golden 1 further warranted to Fannie Mae that its quality control department takes certain post-closing measures intended to detect problems with loan

---

[6] 2018 Selling Guide, § A2-2.1-02 p. 22, Delivery Information and Delivery-Option Specific Representations and Warranties; 2016 Selling Guide, § A2-2.1-02 p. 20, Delivery Information and Delivery-Option Specific Representations and Warranties.
[7] 2018 Selling Guide, § A2-2.1-04 p. 27, Limited Waiver and Enforcement Relief of Representations and Warranties for Mortgages Submitted to DU. 2016 Selling Guide, § A2-2.1-04 p. 26 Limited Waiver of Contractual Warranties for Mortgages Submitted to DU. If using the automated system, the Seller must warrant, among other things, that "[a]ll data pertaining to the mortgage loan is complete, accurate, and not fraudulent, and all data on which the underwriting recommendation was based reflects the final terms of the closed mortgage loan, and otherwise comply with the requirements relating to submissions and resubmissions as stated in [the 2018 Selling Guide] and any relevant supplemental materials."
[8] 2018 Selling Guide, § A2-2.1-02 p. 22, Delivery Information and Delivery-Option Specific Representations and Warranties; 2016 Selling Guide, § A2-2.1-02 p. 20, Delivery Information and Delivery-Option Specific Representations and Warranties.

manufacturing quality, including: (i) reviewing data integrity within automated underwriting systems; (ii) reverifying underwriting decisions and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing quality and fraud prevention.[9] These requirements are set forth in the yearly versions of the Selling Guide, and remain in effect today.

59.     Upon information and belief, Golden 1's Master Contract and any supplemental agreements with Fannie Mae, included, in sum or substance, the following Certification:

> Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with any of the Programs or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (b) the civil False Claims Act (31 U.S.C. §§ 3729-3733). Servicer covenants to disclose to Fannie Mae [] any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.[10]

60.     Golden 1's representations, warranties and certifications that it was underwriting, processing and delivering truthful, investment-quality mortgages according to Fannie Mae's Selling Guide and contractual requirements were material to the GSE's decisions to purchase mortgage loans, and bore upon the likelihood that the borrower would make mortgage payments. When Fannie Mae identifies a material breach of, for example, a warranty (usually during a post-default quality control review of a loan), it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss incurred.

### The FHA Mortgage Insurance Program

61.     FHA, a part of HUD, is the largest mortgage insurer in the world, insuring approximately one third of all new residential mortgages in the United States. Pursuant to the

---

[9] 2018 Selling Guide, Part D, Ensuring Quality Control, p. 1094; 2016 Selling Guide, Part D, Ensuring Quality Control, p. 1175.
[10]   Commitment to Purchase Financial Instrument and Servicer Participation Agreement (Redacted) between Golden 1 and Fannie Mae, entered into on or about November 20, 2009, with an Amendment entered into on March 11, 2015, pp. B-4 and C-1, located at: https://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Documents_Contracts_Agreements/thegolden1creditunion_Redacted.pdf   (last visited Dec. 11, 2018).

COMPLAINT (FCA AND FIRREA)          14

National Housing Act of 1934, FHA offers various mortgage insurance programs. Through these programs, FHA insures approved lenders ("mortgagees" or "lenders"), like Golden 1, against losses on mortgage loans made to buyers of single-family housing. Golden 1 offers FHA loans.

62.     FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements. Under HUD's mortgage insurance programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. HUD also incurs extensive expenses in managing and marketing the foreclosed-upon property until it is resold.

63.     FHA mortgage insurance makes mortgage loans valuable in the secondary markets, as FHA loans are expected to have met HUD requirements and because they are secured by the full faith and credit of the United States.

64.     HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs. Upon information and belief, Golden 1 is a Direct Endorsement Lender ("DEL"), approved by HUD on or about July 23, 2015.

65.     A DEL is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval. To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements, for example, income, credit history, valuation of property, etc., specified in the applicable guidelines.

66.     HUD relies on the expertise and knowledge of DELs in providing FHA insurance. A DEL is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD. The duty of good faith also requires a DEL to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

### *FHA Underwriting and Due Diligence Requirements*

67.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. The underwriter must:

> evaluate [each] mortgagors' credit, characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures.

24 C.F.R. § 203.5(d). Moreover, the underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed by HUD. 24 C.F.R. § 203.S(e)

68.     Mortgagees like Golden 1 must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud, in addition to the responsibility that underwriting decisions are performed with due diligence in a prudent manner.[11] The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters.

69.     HUD relies on DELs to conduct due diligence on Direct Endorsement loans. The purposes of due diligence include determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties, and examining a property offered as security for the loan to determine if it provides sufficient collateral. Due diligence thus requires an reasonable evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral. In all cases, a DEL owes HUD the duty, as prescribed by federal regulation, to exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment.

70.     HUD has set specific rules for due diligence predicated on sound underwriting principles. In particular, HUD requires DELs to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to DELs. These materials specify the minimum due diligence with which DELs must comply.

---

[11] *See* HUD's Single Family Direct Endorsement Program handbook ("HUD Handbook 4000.4"), § 2-4(C)(5), available at: https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4000.4 (last visited Nov. 29, 2018)); HUD's Lender's Guide to the Single Family Mortgage Insurance Process ("HUD Handbook 4155.2"), available at: https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4155.2 (last visited on Nov. 29, 2018)). *See also* HUD's Mortgage Credit Analysis for Mortgage Insurance on One-to-Four-Family Properties ("HUD Handbook 4155.1"), available at: https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4155.1 (last visited Nov. 29, 2018).

71.     With respect to ensuring that borrowers have sufficient credit, a DEL must comply with the HUD Handbooks, such as HUD Handbook 4155.1, to evaluate a borrower's credit. The rules set forth in HUD Handbook 4155.1 exist to ensure that a DEL sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

72.     To properly evaluate a borrower's credit history, a DEL must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

73.     With respect to appraising the mortgaged property (*i.e.*, collateral for the loan), a DEL must ensure that an appraisal and its related documentation satisfy the requirements in the HUD Handbooks. The rules set forth in HUD Handbook 4150.2 exist to ensure that a DEL obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.[12]

### FHA Quality Control Requirements

74.     Like the GSEs, to maintain HUD/FHA approval, a DEL must implement and maintain a quality control program. HUD requires the quality control department to be independent of mortgage origination and servicing functions. To comply with HUD's quality control requirements, a lender's quality control program must, among other things, review a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and conduct a full review of all loans going into default within the first six payments, which HUD defines as "early payment defaults."

---

[12] *See* HUD's Valuation Analysis for Home Mortgage Insurance ("HUD Handbook 4150.2"), available at:
https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4150.2 (last visited Nov. 29, 2018).

75.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information. The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a system of evaluating each quality control sample on the basis of the severity of the violations found during the review.

76.     Under HUD's rules, a lender must report to HUD (along with the supporting documentation) any "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within 60 days of the initial discovery.[13] Upon making such findings, the lender must also expand the scope of the quality control review both by increasing the number of files reviewed and conducting a more in-depth review of the selected files.

77.     In May 2005, HUD issued Mortgagee Letter 2005-26, which notified DELs that they would have to participate in electronic reporting through HUD's online Neighborhood Watch system. The new method became mandatory at the end of November 2005, and required mortgagees "to report serious deficiencies, patterns of noncompliance, or suspected fraud, to HUD in a uniform, automated fashion" and in lieu of written reports to the various HUD Homeownership Centers.

78.     In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings. In particular, quality control review findings must be reported to the mortgagee's senior management within one month of completion of the initial report and management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify the actions being taken, the timetable for their completion, and any planned follow-up activities. Appropriate action by management includes following up with underwriters responsible for material findings to ensure that they are properly trained and diligently reviewing each file before endorsing it for FHA mortgage insurance.

---

[13] *See, e.g.,* HUD's Mortgage Approval Handbook ("HUD Handbook 4060.1"), § 2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices), available at: https://www.hud.gov/program_offices/administration/hudclips/handbooks/hsgh/4060.1 (last visited Nov. 29, 2018).

*FHA Direct Endorsement Lender Certifications*

79. Every Direct Endorsement Lender, including Golden 1, must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan (the "Annual Certification"). The Annual Certification states, in sum or substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

Absent a truthful Annual Certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.

80. In addition to the Annual Certification requirement, after each mortgage closing, the DEL must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program."[14]

81. For each loan that was underwritten with an automated underwriting system approved by FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." For each loan that required manual underwriting, the lender must additionally certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage." HUD relies on each certification to endorse the loan and provide the lender with a mortgage insurance certificate.

**Golden 1's Insufficient Loan Approval Process**

82. The process of approving a single-family home loan mortgage at Golden 1 has

---

[14] *See* HUD's Addendum to Uniform Residential Loan Application, Form HUD-92900-A (exp. 2019), available at: https://www.hud.gov/sites/documents/92900-A.PDF (last visited Dec. 20, 2018); Form HUD-92900-A (exp. 2016), available at: https://www.hud.gov/sites/documents/ARCH_SF_HUD92900A.PDF (last visited Dec. 20, 2018).

COMPLAINT (FCA AND FIRREA)          19

been consistent since approximately May 2015. First, a mortgage loan originator/officer, known at Golden 1 as a Home Loan Advisor ("loan officer" or "HLA"), takes an application from an applicant over the phone, in person or online. If the applicant is not a Golden 1 Credit Union member, the applicant or co-applicant must become a member before the loan is approved. The HLA will complete the application, input the employment and income information after discussing it with the applicant, review the credit report, discuss the sale price or home value with the applicant, and confirm the FICO score. The HLA will then review with the applicant the loan options, rates and will negotiate with the applicant to structure the loan to meet pre-conditional loan approval.

83.     HLAs at Golden 1 generally have the required Nationwide Multistate Licensing System identification number ("NMLS ID"), which authorizes them to discuss specifics of the loan with applicants. HLAs can, among other things, discuss with the applicant how they can reduce the debt-to-income ratio to qualify for higher loan amounts.

84.     Second, if basic guidelines are met and the loan is correctly structured, the HLA submits the application to a pre-conditional approval queue and/or the HLA can run the application through an automated system, for example Desktop Underwriting ("DU"), which is used for loans destined for Fannie Mae. (Golden 1 uses a software program called "ENCOMPAS" for DU.) Once that happens, and depending on the loan type, either an underwriter will review the application for conditions or a processing supervisor will assign the automatically reviewed application to a loan processor.

85.     Some applications require an underwriter to add conditions while other applications are run through DU, where conditions are automatically added. These conditions determine what information, documents and verifications need to be collected for the underwriter to review the application for final approval, pursuant to the applicable Government Program guidelines. The underwriter and/or processor may request additional documents or add conditions, if necessary, as the application is being processed.

86.     Third, the conditionally approved file, with specific conditions set by the underwriter, DU finding, or management (including instructions to secure any missing documents

and verifications needed to clear the conditions), is submitted to a mortgage processing queue. The processing supervisors, including Jason Boggess, Kristofer Genilo and Amy Clawson, then distribute the conditionally approved application to a mortgage loan processor with instructions to gather the required documents.

87.     Golden 1 loan processors, who did not have NMLS IDs after approximately mid-2016, are precluded by law from discussing with applicants the terms of, or changes to, a loan, and cannot make qualification recommendations. They are limited to obtaining information to satisfy the program's and underwriter's conditions because they do not have NMLS IDs.

88.     The type of information and documentation commonly sought by underwriters includes but is not limited to: (1) personal and/or business tax filings; (2) pay stubs and W2s; (3) employment verifications; (4) property title reports; (5) property appraisals; and (6) credit payoff statements.

89.     Moreover, if the underwriter noticed discrepancies within the application, credit report, or other documents, the underwriter can add conditions for the processor to obtain and confirm that the applicants are within Government Program guidelines. For example, an underwriter may request bankruptcy discharge paperwork, tax transcripts, images of damages/repairs, and foreclosure or short sell documents.

90.     While receiving documents, title reports and appraisals, however, a processor may notice additional concerns and can request more documents to contribute to a smooth transaction without delays.

91.     Finally, once all the requested information is obtained by the processor, the file is returned to the underwriter for final approval. If documents were incorrect, insufficient, out of guidelines, or if the processor located information that raised further concerns, the underwriter can add more conditions and request more information.

92.     All applications submitted for final approval must include confirmation with the applicant of the final loan terms, including loan amount, rate, payment, debt payoff, home value, cash needed to close, escrow information, and a loan document signing time within the same or coming few days. The application date, rate lock date and expiration of rates, documents or

payoffs must meet enough time within guidelines to sign the loan, fund the loan and issue payoffs or other funds in order for the loan to meet final approval.

93.  Although loan processors are supposed to be limited to obtaining information to satisfy the conditions, Golden 1 management, including but not limited to Home Loan Department underwriting managers Ginger Johnson, Lori Adams, and Georgia Dudley, and Processing Supervisor Jason Boggess, among others, regularly encouraged loan processors (including former processors Theaurty Howard and Marella Chua) to discuss mortgage rates and loan amounts obtained during the loan processing with the applicants, and to address with them actual or potential loan changes based on the applicant's debt to income ratio, home value, or other information obtained during processing.

94.  The managers encouraged processors to make specific recommendations to applicants about how the applicant could lower their debt to income ratio to qualify for a higher loan amount. In fact, in many instances, managers also had these discussions with applicants. Neither the processors nor the managers had the required NMLS ID.

95.  If a processor asked some or all of the HLAs to discuss loan changes, rates or amounts – or make recommendations for reducing debt-to-income ratios – the HLA's typical response was either not to do it or to significantly delay the process; either of which would have a dramatic negative impact on the turnaround time (or "turn time") for the affected applications, and consequently on the processor's and manager's bonuses. As explained below, some bonuses at Golden 1 were based on not only the number of approved loans, but on the turn time – how quickly the loans were approved.

96.  Also, by allowing lower paid loan processors to communicate complex issues with applicants, this helped Golden 1's bottom-line by freeing up higher paid HLAs to work on producing fresh applicants. This is only a small sample of the shortcuts Golden 1's home loan department takes in approving Government Program loans.

## Golden 1's Systematic Efforts to
## Maximize Profits from Government Programs

97.  The Government Programs rely upon lenders, including Golden 1, to diligently

comply with the requirements and standards set forth by the Government Programs and to certify compliance, both with respect to participation in programs and/or with respect to individual loans referred for participation in the Government Programs. That is, they depend on lenders to approve only eligible home loans.

98.    Golden 1, however, sought to maximize profits from the Government Programs by ignoring loan origination, underwriting, processing, quality assurance, and other standards to decrease their bottom-line while at the same time increasing loan volume and approval speed, contrary to Golden 1's many certifications, representations and warranties.

99.    Golden 1 required underwriters to make loan decisions on extremely short turnaround times and employed lax and inconsistent underwriting and processing standards and controls which failed to follow the requirements of the Government Programs.

100.    The heavy volume of loans, and Golden 1's push for speedy approvals, overwhelmed underwriters and loan processors, further contributing to extremely poor loan quality. Moreover, Golden 1 attempted to further increase loan volume and speed by permitting unqualified and inadequately trained individuals to underwrite and process loans.

101.    Golden 1 improperly waived and ignored conditions underwriters had placed on loan approvals to permit the loans to close even where necessary and proper conditions had not been met, using fraudulent "processor certs" or reckless "management-exceptions" to push through ineligible loans. Through these and a variety of other pervasive practices described below, Golden 1 increased its loan volume and turn time at the expense of Government Program requirements and standards, all in contradiction to Golden 1's certifications of compliance with the Government Programs.

102.    As a prerequisite to participating in the Government Programs, Golden 1 expressly certified (and/or, through participation in the Government Program, impliedly certified) its compliance with the requirements of the Government Programs. Additionally, and/or in the alternative, in submitting each loan for insurance or for sale to the GSEs, Golden 1 expressly or impliedly certified that it had complied with the requirements of the Government Program in submitting that loan.

103.    Golden 1 knowingly and/or recklessly caused to be made or used false records or statements, including for example the false certifications and representations of compliance with the Government Programs which Golden 1 caused to be made in connection with its participation in the Government Programs and/or when it submitted loans for insurance and/or for payment or reimbursement.

104.    Golden 1 engaged in pervasive and systematic efforts to increase its profits by submitting or causing to be submitted claims for payments and reimbursements in connection with the Government Programs that the United States, upon information and belief, would not have made but for Golden 1's false representations, warranties, and certifications of compliance with the requirements of the Government Programs.

105.    Golden 1's failure to comply with the requirements of the Government Programs extends, upon information and belief, to each of Golden 1's locations throughout California as part of Golden 1's efforts to maximize its profits companywide.

106.    Golden 1's failure to comply with the requirements of the Government Programs was, upon information and belief, caused and communicated by Defendant's management and managers to underwriters and other employees and staff company-wide. The upper management included Greg Brown (Senior Vice President / Chief Lending Officer (Nov. 2015 to present)), Michael Popp (Senior Vice President / Home Loans (March 2013 to present)), and Charity Mendonza (Operations Department Manager (March 2016 to present)). Managers in the underwriting and processing units included Ginger Johnson, Lori Adams, Georgia Dudley, Jason Boggess, Kristofer Genilo, Sherry Densmore and Amy Clawson. HLA/loan officer managers included Eric Burgess and Ali Nassirian.

107.    The quality of Golden 1's loans was affected by Golden 1's practices, including:

- lax and inconsistent processing and underwriting standards and controls;
- pressure and directives to underwriters and loan processors to violate or avoid requirements and standards of the Government Programs;
- failure to provide sufficient training to its staff;
- failure to update internal underwriting guidelines;

- use of unqualified individuals to process and underwrite loans;
- use of processors to communicate complex issues with borrowers to free up loan officers;
- failure to properly process and close loans; and
- failure to undertake proper and sufficient quality control processes;

108. Golden 1's management was aware, or should have been aware, that such practices resulted in the endorsement of loans for participation in the Government Programs that did not comply with applicable standards and requirements. Management, however, failed to take effective action to address deficiencies in its loan processing and underwriting practices.

109. Instead, Golden 1 reaped profits by certifying that its loans met the applicable standards and requirements and were therefore eligible to participate in Government Programs. As a result of Golden 1's loan certifications, the United States has suffered damages as a result of defaulted loans participating in Government Programs when Golden 1 knew, or should have known, those loans did not meet the applicable standards and requirements and were therefore ineligible to participate in Government Programs.

110. Golden 1 abused its Direct Endorsement Lender status through its false and fraudulent certifications, representations and warranties. As a DEL, Golden 1 regularly violated applicable standards and requirements, prudent underwriting practices, and Golden 1's duties to the Government Programs by failing to conduct proper due diligence on mortgages that it reviewed and approved for participating in the Government Programs, and by failing to comply with applicable quality control standards and requirements.

111. Despite their repeated violations of applicable standards and requirements, Golden 1 falsely certified, both annually and on a loan-by-loan basis, that it had complied with those standards and requirements, and that the mortgages they endorsed were eligible. Upon information and belief, had the United States known that Golden 1 mortgage eligibility certifications, representations and warranties were false, the United States would not have permitted Golden 1 to endorse those loans, nor would it have permitted Golden 1 to maintain its status as a DEL.

**Golden 1's Reckless, Negligent and/or Grossly**

**Negligent Underwriting and Processing Practices**

112.    Golden 1 knew or should have known that its representations, warranties, and certifications of compliance were false. In the alternative, in falsely representing, warrantying, and certifying compliance, Golden 1 acted with deliberate ignorance and/or reckless disregard of the truth. In the alternative, Golden 1's false representations, warranties, and certifications, as well as its failure to implement proper underwriting and processing practices and procedures, were reckless, grossly negligent and/or negligent.

113.    Golden 1's false claims, as well as its reckless, negligent, and grossly negligent conduct in violation of Government Program standards and requirements, violated its fiduciary obligations and duty of care to the Government Programs.

114.    As set forth above, the Government Programs require a lender to represent that the underwriting conditions are met for all loans processed through the lender's system. As part of both the annual certifications and individual loan certifications, Golden 1 certified that it complied with the required level of quality control and duty of care.

115.    Contrary to Golden 1's representations, warranties, and certifications that it complied with requirements of the Government Programs, as well as the individual certifications appearing on each and every mortgage endorsed by Golden 1, Golden 1 engaged in reckless, negligent, and grossly negligent underwriting practices in violation of applicable standards and requirements.

116.    Golden 1's loan quality issues were fueled by management's emphasis and pressure on underwriters to approve as many loans as possible, at as high a rate as possible, churning out loans at a rapid pace that were then passed on to the Government Programs.

117.    Golden 1 did not emphasize compliance with Government Program guidelines and regulations, but instead focused on finding ways to get loans underwritten, processed and approved in the fastest way possible.

118.    The instances set forth below are non-exhaustive examples.

//

COMPLAINT (FCA AND FIRREA)          26

*Poor Planning from the Beginning*

119.    The underlying causes of Golden 1's serious loan quality problems and reckless underwriting and processing are multifold. Beginning in at least approximately May 2015, Golden 1 substantially expanded its home loan division, focusing on first-time borrowers. To facilitate this substantial increase in loan origination, processing and underwriting, in early 2015 Golden 1 expanded its home loan staff, throwing together a team of low paid temporary employees and inexperienced underwriters from other Golden 1 departments to review home loans processed for the Government Programs.

120.    Many underwriters, including Relator, were transferred from the auto loan department, or were friends or relatives of managers, and received little if any training. Loan processors, used by Golden 1 to review, collect, and organize required loan documentation and information, were often temporary employees, and untrained, inexperienced and underpaid.

***No Proper Training or Reference Materials for Government Programs***

121.    Golden 1 did not conduct formal training, and most of its employees were not adequately trained with respect to the requirements of the Government Programs. In addition, Golden 1 provided little guidance to underwriters and processors. For example, Golden 1's internal underwriter guide was sparse, poorly drafted, and rarely updated to reflect, for example, the constant updates to the HUD Handbooks and the Selling Guide.

122.    Relator recalls that from approximately May 2016 through 2018, Golden 1's internal underwriter guide was updated only one or two times, where Fannie Mae's Selling Guide was updated over 30 times since May 26, 2015. Relator understood this shortcoming and did not rely on Golden 1's guide; she accessed Fannie Mae's website to at least have some guidance. But not all underwriters knew, or cared, about following the complex requirements set by the Government Programs, nor did they realize the Selling Guide was continually updated. And management provided no clear direction.

123.    Golden 1's senior management was aware that these employees had insufficient reference materials and had not received the in-depth training necessary to properly underwrite and process loans, because underwriters complained to management.

124.    Relator was acutely aware that the underwriters and processors did not have knowledge of the requirements of the Government Programs, because they would come to her to ask basic questions about Government Program guidelines. In particular, employees were unqualified to calculate the debt-to-income ratios as required by the Government Programs.

125.    Similarly, Golden 1's failure to provide underwriters with information regarding audit findings, as discussed below, further prevented underwriters from gaining useful information and experience that would assist them in increasing compliance with applicable standards and requirements.

126.    Golden 1 uses a software program called "ENCOMPASS" to run loan applications through the automated underwriting system, called Desktop Underwriter or DU. Golden 1 conducted no formal training to instruct loan officers, processors or underwriters how to use the system. In fact, some employees did not even know Golden 1 had DU available.

### Golden 1 Told Underwriters to Use Their 'Authority'

127.    In addition to the intense pressure to move quickly, another underlying cause of Golden 1's loan quality failings was its overall directive to underwriters to ignore the requirements of the Government Programs; to interpret the application in a way that would permit approval; and to "use your underwriter authority" to find a way to approve a loan. Management would tell underwriters this constantly, meaning that underwriting personnel were told to approve loans by deliberately disregarding the standards and requirements of the Government Programs. As underwriters, management emphasized, underwriters had the authority to approve loans that did not necessarily meet requirements.

128.    This direction may work for loans serviced by Golden 1 in its own portfolio, but this violated the strict underwriting requirements for Government Program loans.

129.    Many Golden 1 underwriters reasoned that because management told them to use their "authority," they should use it at all times, whether the loan was meant for a Government Program or Golden 1's own portfolio. Those underwriters were often requested by loan officers and relied upon by managers to approve loans that did not meet the requirements. For example, a Golden 1 underwriter that worked there from in or about November 2014 to in or about September

2017, Underwriter 1, approved almost every home loan file she was presented. Underwriter 1 did not take time to follow the necessary guidelines or review the documents in their entirety. Her goal, upon information and belief, was to have the most loans approved in the department and increase turn time.

130.     Processors, including former processor Theaurty Howard, submitted several files to Underwriter 1 between July 2015 and April 2017 with payoff dates not within guideline or with inadequately dated statements. Underwriter 1, however, would approve the insufficient files. Processors knew Underwriter 1 would skip over pertinent information and they could bend rules on her files most of the time. Management praised Underwriter 1 with time off and other rewards.

### *Don't Dig Too Deep*

131.     Management constantly warned underwriters, including Relator, that "you're digging too deep." Golden 1 did not want to look for any reasons to weaken the borrowers' applications. Management's emphasis was not on finding a way to make the most appropriate decision, but instead to rapidly find any way to get a file approved.

132.     Underwriters, including Relator, were instructed to ignore the express requirements and standards of Government Programs and to instead focus on the positive aspects of each application. For example, managers made comments to underwriters to the effect that, where a borrower had a strong FICO score, the underwriter should not "dig too deep"; that is, the underwriter should make a cursory review rather than a full underwrite under the Government Program requirements. Relator and other underwriters were even told by managers to "use your underwriter authority" or to "act like you didn't see it" when the underwriters found something that indicated something negative in the borrower's record.

### *Pressure to Increase Turn Time*

133.     In addition to facing heavy pressure to approve loans, underwriters were constantly pressured to underwrite as many loans as quickly as possible, which meant that files were not being appropriately reviewed, and thus approvals granted not on the strength of the file, but because Golden 1 pressured the underwriters to quickly process the file.

134.     To incentivize underwriters to move faster, management awarded monthly

"trophies" to underwriters. The "Rabbit Award" went to the underwriter that approved loans the fastest; other awards went to the underwriter that approved the most loans in a given month. The awardees received positive recognition in meetings and even gift cards.

135.    Relator pointed out to managers that these awards gave the wrong message – they incentivized the underwriter to approve more files, versus reviewing the files to fit the guidelines, as required by the Government Programs.

136.    Managers required that each underwriter process a minimum of six to eight loans per day. Underwriters were instructed to process no less than that per day, despite the fact that that was not sufficient time to review files with the required level of care. Thus, Golden 1 required loans to be reviewed in a negligent and reckless manner.

137.    Underwriters were not reprimanded for approving suspect loans, but those who did not approve the minimum number of loans, or were slower in making approvals, were called in for one-on-one sit-down meetings with management. They were told to "increase production," "move faster," and to "approve, not investigate," especially near the end of the month if the department had not met its goals.

138.    Golden 1 ostracized and penalized underwriters that adhered to the government regulations because it resulted in fewer or slower approvals. Underwriters who adhered closer to the government regulations were given a reputation by Golden 1's management, processors and loan officers as "unapproachable" or "difficult."

139.    Managers and supervisors told underwriters they were simply passing on the pressure received from higher levels of management, based upon internal reports regarding underwriter activity. Higher level managers included Greg Brown, Michael Popp, and Charity Mendonza.

140.    Upon information and belief, top level managers in the home loan department received bonuses based, at least in part, on the number of approvals and quick turn times. For example, according to Golden 1's IRS-990s filed for 2013 through 2016, the following upper level managers received the indicated bonuses:

| Name | 2013 | 2014 | 2015 | 2016 |
|------|------|------|------|------|
| Brown, Greg (Chief Lending Officer) | n/a | n/a | 31,259 | 54,752 |
| Popp, Michael (Senior Vice President / Home Loans) | 28,802 | 33,151 | 37,655 | 33,147 |
| Burgess, Eric (Senior manager Home Loan Production) | n/a | n/a | 64,800 | 0 |
| Musci, Richard (Chief Lending Officer) | 0 | 32,455 | -- | -- |

141.    Loan processors, who also received bonuses based on approved loans and turn time, would ask mangers to assign certain underwriters to questionable applications, so as to avoid the "unapproachable" or "difficult" underwriters and a possible declination or delay. Managers would grant these requests, and often decide to use less "difficult" underwriters even where loan officers or processors did not make a request – to ensure more and quicker approvals.

**Golden 1 Failed to Conduct Due Diligence in**

**Accordance with Loan Standards and Requirements**

142.    Contrary to Golden 1's certifications, representations and warranties, as well as the individual certifications appearing on each and every mortgage endorsed by Golden 1, Golden 1 failed to conduct due diligence in accordance with applicable standards and requirements as well as sound and prudent underwriting principles.

143.    On a loan by loan basis, Golden 1 repeatedly lied to the Government Programs to obtain approval of mortgages that never should have been approved. These mortgages were not eligible under the required criteria of each Government Program. Notwithstanding the mortgages' ineligibility, Golden 1's underwriters endorsed the mortgages by falsely certifying that they had conducted the due diligence required by the Government Programs' rules and regulations when, in fact, they had not. By endorsing ineligible mortgages and falsely certifying compliance with the Government Programs, Golden 1 fraudulently obtained approval of these ineligible mortgages.

144.    Golden 1 knew or should have known that its certifications of compliance were false. In the alternative, in falsely certifying compliance, Golden 1 acted with deliberate ignorance

and/or reckless disregard of the truth. In the alternative, Golden 1's false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

145.    As set forth above, the Government Programs require a lender to represent that the underwriting conditions are met for all loans processed through the lender's system. As part of both the annual certifications and individual loan certifications, Golden 1 certified that it complied with the required level of due diligence for each loan.

146.    In violation of their certifications, representations and warranties, Golden 1 used a wide range of strategies to avoid compliance with the Government Programs. Violations of the Government Programs' underwriting and due diligence requirements included:

- failure to properly use the Government Programs' automated underwriting systems;

- failure to adequately verify gift funds;

- failure to properly verify the applicant's employment;

- approval of loans with unacceptable debt-to-income ratios without compensating factors;

- failure to identify fabricated and falsified income and asset documentation; and

- other systemic failings, including "processor certs" and "management-exceptions."

The non-exhaustive examples illustrate this pattern of false certifications. These examples were not isolated events, but rather provide a representative sample of Golden 1's knowingly fraudulent and pervasive practices.

### Abusing the Automated Underwriting System

147.    Fannie Mae's automated underwriting system is Desktop Underwriter ("DU"). The lender enters the data from the borrower, and the automated system evaluates mortgage delinquency risk and arrives at an "underwriting recommendation" by relying on a comprehensive examination of the primary and contributory risk factors in a mortgage application.[15] DU analyzes

---

[15] *See* 2018 Selling Guide, § B3-2-03, p. 300, Risk Factors Evaluated by DU; 2016 Selling Guide, § B3-1-01 p. 308, Comprehensive Risk Assessment.

the information in the loan casefile to reach an overall credit risk assessment to determine eligibility for delivery to Fannie Mae.

148.    DU does not, however, definitively approve an application; it makes an "underwriting recommendation." For example, DU does not evaluate a loan's compliance with federal and state laws and regulations including, without limitation, a loan's potential status as a qualified mortgage under applicable laws and regulations. "Lenders bear sole responsibility for complying with applicable laws and regulations, and these compliance obligations may not be imposed upon or shared by Fannie Mae."[16]

149.    When the automated system determined, based upon Golden 1's data entry, that a loan was acceptable, underwriters were encouraged by Golden 1 to approve that loan rather than applying their own judgment and discretion, even in instances where the underwriter's experience suggested that the automated system should not have approved the application. Again, underwriters were told by Golden 1 managers to "use your underwriter authority." Golden 1 management told underwriters that they did not need to worry about approving those loans because the application had passed the automated system and therefore the underwriter was not accountable for a default. Managers said, in substance, "As long as it cleared DU, you'll be fine."

150.    On the other hand, when the automated system did *not* recommend a loan, Golden 1 found numerous ways to manipulate the system to approve the loan, in violation of applicable standards and regulations described herein. Managers and loan processors would "adjust" data entered into the system, including, for example, income or asset values, then re-run the application through DU even where the guidelines required a manual underwriting.

### *Failure to Properly Track 'Gift Funds'*

151.    A borrower of a mortgage secured by a principal residence may use funds received as a personal gift from an "acceptable donor." Acceptable donors for GSEs include "the borrower's spouse, child, or other dependent, or by any other individual who is related to the borrower by blood, marriage, adoption, or legal guardianship; or a fiancé, fiancée, or domestic

---

[16] 2018 Selling Guide, § B3-2-01, p. 289, General Information on DU; 2016 Selling Guide, § B3-2-01, p. 310, General Information on DU.

partner."[17] Moreover, the donor may not be affiliated with the builder, developer, real estate agent, or any other interested party to the transaction. Thus, underwriters must confirm the source of a borrower's gift funds to satisfy the guidelines.

152.    Golden 1 managers, loan officers and processors, however, would tell borrowers relying on gift funds to deposit gift funds into a Golden 1 checking or savings account. Once that was done, under internal policies the processor was not required by Golden 1 management to verify the source of the gift funds, violating the guidelines.

### *'Cover Your Ass' and Reckless Management-Exceptions*

153.    The managers effectively trained underwriters to ignore applicable standards and regulations by directing the underwriter to overlook or ignore a requirement. To make underwriters comfortable in doing this, Golden 1 management would assure the underwriter that, for example, "you won't get caught"; meaning it was unlikely that any particular loan would be audited by Golden 1's internal auditors, or by the Government Programs, and therefore the underwriter would not be responsible for subsequent issues, including default. Managers also reasoned that until the auditors catch something, "there's no problem." Underwriters often conveyed these instructions to each other informally, resulting in lax approaches being applied to countless loans.

154.    Golden 1 required underwriters to document in the software program "ENCOMPASS" the actions the underwriters took that contradicted the requirements of the Government Programs. Underwriters referred to this as doing a "CYA" (*i.e., Cover Your Ass*). When a loan did not meet the guideline requirements for the Government Programs, managers told underwriters to type a brief description of the "exceptions" that they used to manipulate the approval process.  Before January 2018, underwriters were told by management not to enter their comments in the "Comments" section in "ENCOMPASS," but in a "place holder" within the file folder where the required documents for the application were electronically saved. This way, upon information and belief, auditors would not easily discover the fraud.

155.    Golden 1 instructed underwriters to document what was done in this manner, but

---

[17] 2018 Selling Guide, § B3-4.3-04, pp. 425-27, Personal Gifts (last updated 09/29/2015).

not to provide the specific reasons. Despite possibly flagging issues with non-conforming loans via this process, upon information and belief, these internal comments made on "ENCOMPASS" were rarely, if ever, submitted to the Government Programs.

156.    If an underwriter did not approve a loan because it did not meet the appropriate requirements, the decision would typically be reversed by management, often using the unsubstantiated reason managers referred to as a "management-exception." In the event that a manager "waived' a condition that an underwriter flagged, managers noted in "ENCOMPASS" that they waived the conditions, but they did not provide the reasons.

157.    The purpose of the management-exception was to bypass Government Program guidelines. Logically, management would not need to use a management-exception unless the loan did not satisfy some aspect of the Government Program requirements in the first place. There is no other reason to use an exception otherwise.

158.    Managers used this in an attempt to assure underwriters that their approval of an ineligible application would not negatively affect them if the borrower eventually defaulted – because the manager ostensibly over-ruled the underwriter.

159.    Those underwriters that did not adhere to Golden 1's requirements on the waiving of conditions were reprimanded. For example, underwriters that did not subsequently waive conditions that managers waived via the "ENCOMPASS" system would be subject to scolding and other retaliatory harassment.

160.    Where an underwriter identified issues with a particular application, underwriters were pressured by management to conditionally approve the loan, rather than pending the loan until the issues could be corrected.

161.    Underwriters were further incentivized to approve, rather than pend loans, because when a pended loan would later be returned to the underwriter for additional review it would not count toward the underwriter's required daily minimum requirements.

162.    Even where the Government Programs' automated system required certain conditions for approval, those conditions were routinely waived by Golden 1 managers rather than satisfied prior to closing. Golden 1 had no quality control process to verify that any

conditions set by the automated system had been satisfied.[18]

### *False Asset and Employment Verifications*

163.   In some instances, the loan processors – who were not trained regarding requirements of the Government Programs – would fail to adequately check that the documentation provided actually supported the condition placed by the underwriter or DU. For example, if a condition required an additional pay stub to confirm income, the loan processor would ask for and often receive a "management-exception" upon receipt of the additional pay stub even where that document showed a significant decrease in income and, therefore, did not actually satisfy the condition.

164.   In another common example, if an underwriter's condition required an additional income verification for a borrower's claimed overtime or bonus income, the loan processor would ask for and often receive a "management-exception" without securing verification of continued overtime/bonus income from the borrower's employer.

165.   Managers would approve loans where proper verification had not been obtained. For example, income would be inflated by including a second job that did not qualify and/or had not been properly verified; income would be inflated by "grossing up" certain non-taxable income without proper verification.

166.   Golden 1 managers approved loans where the required documentation did not meet the required standards of authenticity. For example, processors were trained to verify a borrower's employment with only a quick "Google search," and not by actually calling an individual's employer and requesting the required documentation, or contacting a third-party employment verification vendor.[19]

167.   Additionally, processors would not take the time to actually verify that borrowers filed tax returns with the IRS or the California Franchise Tax Board that were supplied to Golden

---

[18] "A lender that acquires loans underwritten with DU must include in its QC processes appropriate procedures to . . . verify that any conditions specified in the DU Underwriting Findings report have been satisfied" 2018 Selling Guide, § A2-2.1-05, p. 31, Invalidation of Limited Waiver of Representations and Warranties; 2016 Selling Guide, § A2-2.1-05, p. 29, Invalidation of Limited Waiver of Representation and Warranties.

[19] *See* 2018 Selling Guide, § B3-3.1-02, p. 323, Standards for Employment Documentation; 2016 Selling Guide, § B3-3.1-02, p.341, Standards for Employment Documentation.

1 to verify income or employment.

### Processor Certs

168.   Golden 1 engaged in a variety of other strategies and specific instances of avoiding, subverting and violating the standards and requirements of the Government Programs, including accepting "processor certs" in lieu of legitimate information verifications. A "processor cert" at Golden 1 is a written *certification* by the loan processor that the processor verified a certain piece of information in response to a condition set by the underwriter or the automated system.

169.   For example, instead of receiving a Verification of Employment ("VOE") letter from an employer, loan processors routinely verified employment by searching the internet or by calling someone at the employer – or by not doing the research at all and trusting the application. Because requesting and receiving a VOE may take too much time (increasing the precious turn time), or not be possible, the processor would file the "processor cert" with management claiming the processor had verified the information, and management would in turn provide a "management-exception" to waive or approve the condition.

170.   Moreover, processors failed to consistently verify tax returns by receiving "IRS transcripts," as required when using tax return information to approve a loan.

171.   In some situations, Relator witnessed up to ten "processor certs" in a single Government Program loan file. The same logic applies here as to "management-exceptions" – there would be no need for "processor certs" where the guidelines are being properly followed.

### Policy Not to Contradict the Borrower

172.   Golden 1 instructed underwriters that they were not to contradict the word of the borrower and, therefore, where a borrower provided a letter setting forth relevant information, the underwriter was not permitted to question that information or to obtain proper verification of the information.

173.   Similarly, where Golden 1 obtained additional information that was not required for underwriting purposes, for example, additional tax returns, Golden 1 would fail to take into account additional issues indicated by that paperwork. For example, if unrequired paperwork

indicated there were alimony or child support obligations that the borrower failed to disclose, mangers told underwriters not to "dig too deep" or for them to use their "underwriter authority."

**Golden 1 Failed to Comply with Quality Control Requirements**

174.    Contrary to Golden 1's certifications, including the individual certifications appearing on each and every mortgage it endorsed, Golden 1 failed to ensure proper quality controls in accordance with applicable standards and requirements as well as sound and prudent underwriting principles.

175.    Golden 1 knew or should have known that its certifications of compliance were false. In the alternative, in falsely certifying compliance, Golden 1 acted with deliberate ignorance and/or reckless disregard of the truth. In the alternative, Golden 1's false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

176.    Golden 1's false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of applicable standards and requirements violated Golden 1's fiduciary obligations and duty of care to the Government Programs.

177.    Contrary to its annual and individual certifications, Golden 1 did not maintain proper quality controls in accordance with applicable standards and requirements. The following are some examples of Golden 1's pattern and practice of failing to conduct proper due diligence.

178.    Golden 1 failed to provide underwriters with information regarding material findings and other issues identified during internal audits, including those that arose in the context of a default or Early Payment Default. This information would have assisted underwriters in avoiding repeated errors and in improving compliance with the standards and regulations set out by the Government Programs.

179.    Golden 1's managers did not provide underwriters with information about loans that had defaulted, because, upon information and belief, Golden 1 did not actually conduct internal quality control audits, or because management did not want underwriters to "tighten up"; meaning management did not want to slow down the constant flow of approved loans even if doing so meant to ensure quality loans that met Government Program requirements.

//

COMPLAINT (FCA AND FIRREA)        38

**Golden 1's False Certifications Damaged the Government**

180.     Upon information and belief, the United States has been deprived of payments from Fannie Mae because of Golden 1's improper actions. For example, just one Golden 1 loan officer originated $8,845,154 in Fannie Mae loans from on or about February 26, 2016 through March 23, 2017, which was approximately 25 per cent of the total of all loans he originated. During that period, Golden 1 employed approximately 50 loan officers.

181.     Upon information and belief, as of December 2018, HUD has paid millions in FHA insurance claims and related costs arising out of Golden 1's approval of mortgages for FHA insurance. HUD can expect to pay millions of dollars in further FHA insurance claims as additional mortgages approved by Golden 1 default in the coming months and years.

182.     Upon information and belief, the Government would not have suffered these losses absent Golden 1's false and fraudulent certifications, representations and warranties.

183.     Moreover, Golden 1 is liable for submitting so-called reverse false claims because, by fraudulently causing Fannie Mae to expend potentially millions of dollars on default and foreclosure-related expenses, Golden 1 caused a reduction in the amount of money Fannie Mae paid Treasury pursuant to the terms of the Third Amendment to the Senior Preferred Stock Purchase Agreement between the GSEs and Treasury.

184.     Every dollar subtracted from the bottom line of the GSEs by fraud is potentially passed along to the United States to the extent it results in or worsens a net shortfall. And, in the event of a net shortfall, the United States is contractually obligated to cover that shortfall – as it did in early 2018 and may again in the coming months and years.

185.     Golden 1's false certifications, representations and warranties were material and bore upon the likelihood that borrowers would make mortgage payments.

186.     The Government has therefore been damaged by Golden 1's false claims and certifications.

//

//

//

## COUNT I

### (Federal False Claims Act - 31 U.S.C. § 3729(a)(1)(A))

187.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

188.    As set forth above, Defendant knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of their loans at the time of their sale or insurance to the Government Programs, including that the loans were of investment quality and complied with the Government Program guidelines, selling guides, and purchase contracts.

189.    Defendant's misrepresentations about loan quality were capable of influencing and thus material to the Government Programs' decisions about purchasing or insuring such loans.

190.    The Government Programs have incurred losses as a result of Defendant's misrepresentations in the form of paying guarantees to third parties after the affected loans defaulted.

191.    Treasury funds have been used to purchase or insure Defendant's loans and to reimburse the losses incurred by the Government Programs as a result of paying either insurance or guarantees to third parties after the loans purchased or insured from the Defendant defaulted.

192.    Treasury funds to the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), for example, to prevent disruptions in the ability of mortgage finance.

193.    By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(A), for each of the loans sold to the Government Programs in violation of the Government Program requirements, Defendant knowingly, or acting in deliberately ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

194.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation committed by Defendant on or before November 2, 2015, and not less than $10,781.00 and not more than $21,563.00 for each violation committed by Defendant after November 2, 2015 (See 81 Fed. Reg. 42491, 42494 (Jun.

30, 2016)), plus three (3) times the amount of damages which the Government Programs and the United States have sustained because of Defendant's actions.

## COUNT II

### (Federal False Claims Act - 31 U.S.C. § 3729(a)(1)(B))

195.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

196.     As set forth above, Defendant knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of their loans at the time of their sale or insurance to the Government Programs, including that the loans were of investment quality and complied with the Government Program guidelines, selling guides, and purchase contracts.

197.     Defendant's misrepresentations about loan quality were capable of influencing and thus material to the Government Programs' decisions about purchasing or insuring such loans.

198.     The Government Programs have incurred losses as a result of Defendant's misrepresentations in the form of paying guarantees to third parties after the affected loans defaulted.

199.     Treasury funds have been used to purchase or insure Defendant's loans and to reimburse the losses incurred by the Government Programs as a result of paying either insurance or guarantees to third parties after the loans purchased or insured from the Defendant defaulted.

200.     Treasury funds to the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), for example, to prevent disruptions in the ability of mortgage finance.

201.     By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for each of the loans sold to the Government Programs in violation of the Government Program requirements, Defendant knowingly, or acting in deliberately ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

202.     Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation committed by Defendant on

or before November 2, 2015, and not less than $10,781.00 and not more than $21,563.00 for each violation committed by Defendant after November 2, 2015 (See 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016)), plus three (3) times the amount of damages which the Government Programs and the United States have sustained because of Defendant's actions.

## COUNT III

### (Violation of the False Claims Act: Reverse False Claims (31 U.S.C. § (a)(1)(G))

203.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

204.     Plaintiff seeks relief against Defendant under Section 3729(a)(1)(G) of the False Claims Act, for all false and fraudulent claims that Defendant caused to be submitted through Fannie Mae's quarterly dividend payment obligation pursuant to the Third Amendment to the SPA beginning in at least approximately 2013.

205.     Because the Third Amendment obligates Fannie Mae to make quarterly dividend payments of its net revenues in excess of a capital reserve, and because any monies that Fannie Mae uses to pay its servicing expenses necessarily results in a decrease to its net revenues, the monies that Fannie Mae paid associated with Defendant's false and fraudulent approval of home loans decreased the amount of dividend payments to which the United States otherwise would have been entitled and received.

206.     Accordingly, as set forth above, by knowingly causing foreclosure and other related expenses to be paid by Fannie Mae, Defendant knowingly caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the United States. Thus, the United States has incurred losses in the form of decreased quarterly dividend payments from Fannie Mae because of Defendant's fraudulent conduct.

207.     Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendant is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation committed by Defendant on or before November 2, 2015, and not less than $10,781.00 and not more than $21,563.00 for each violation committed by Defendant after November 2, 2015 (See 81 Fed. Reg. 42491, 42494 (Jun. 30, 2016)), plus three (3) times the amount of damages which the Government Programs and the

United States have sustained because of Defendant's actions.

## COUNT IV

### (Violations of FIRREA)

208.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

209.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false individual loan certifications stating that loans were eligible for participation in Government Programs and that Defendant had complied with other requirements including maintenance of data integrity and/or due diligence.

210.    Defendant submitted such false certifications using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1006, 1014, 1341, and 1343. Further, as part of Defendant's scheme to avoid informing the United States and/or Government Programs of the loan quality problems it was experiencing and to avoid requests by the United States and/or Government Programs for indemnification on individual loans, Defendant knowingly made numerous material fraudulent representations to the United States and/or Government Programs using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1006, 1014, 1341, and 1343.

211.    Defendant made these statements to the United States and/or Government Programs with respect to the loans that it recklessly originated and underwrote, and with respect to the loans that Defendant failed to self-report, with the intent to defraud or deceive the United States and/or Government Programs into purchasing and/or endorsing loans that were ineligible for participation in the Government Programs, and to defraud or deceive the United States into paying insurance claims for loans that were not eligible for insurance.

212.    Accordingly, Defendant is liable to the United States for civil penalties as authorized under 12 U.S.C. § 1833a, in the amount of up to the greater of (i) $1 million per violation, (ii) the amount of loss to the United States, or (iii) the amount of gain to Defendant.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.    A judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's

violations of the False Claims Act;

b.     A judgment against Defendant for a civil penalty of $11,000 for each of Defendant's violations of the False Claims Act committed on or before November 2, 2015;

c.     A judgment against Defendant for a civil penalty of $21,563.00 for each of Defendant's violations of the False Claims Act committed after November 2, 2015;

d.     A judgment against Defendant for civil penalties under FIRREA up to the maximum amount of $1 million, or the amount of gain to the Defendant, or, if greater, the amount of loss to the United States stemming from such conduct.

e.     Attorneys' fees, expenses and costs of suit herein incurred by or on behalf of the Relator under the FCA; and

f.     An award to the Relator of the maximum allowed under 31 U.S.C. § 3730(d);

g.     An award of pre-judgment interest; and

h.     Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Relator and Plaintiffs hereby demand that this matter be tried before a jury.

Date: February 1, 2019                    Respectfully Submitted,

Clayeo C. Arnold,
A Professional Law Corporation
M. Anderson Berry, Esq.
Leslie Guillon, Esq.

M. Anderson Berry, Esq.
Attorney for Relator Kira Hutcherson

COMPLAINT (FCA AND FIRREA)          44